UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KARISSA COLON,

       Plaintiff,

v.                          6:11-CV-00082 (NPM)

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.
----------------------------------------------------------------------------------------------------

APPEARANCES               OF COUNSEL

Olinski Law Group          Howard D. Olinsky, Esq.
300 S. State Street          Karen S. Southwick, Esq.
5th Floor, Suite 520
Syracuse, NY 13202

U. S. Social Security Administration   John M. Kelly, Esq.
Attorney for the Defendant
26 Federal Plaza - Room 3904
New York, NY 10278

NEAL P. McCURN, Senior U.S. District Court Judge

## MEMORANDUM - DECISION AND ORDER

Plaintiff Karissa Colon ("plaintiff") brings this action pursuant 42 U.S.C. §

405(g) and 42 U.S.C. §1383(c)(3) of the Social Security Act, appealing a final

decision of the Commissioner of Social Security ("defendant") denying plaintiff's

claim for Social Security disability benefits ("SSDI")and Supplemental Security

Income ("SSI") benefits.  For the reasons stated below, the defendant's motion for

judgment on the pleadings (Doc. No. 11) is granted.

## I.    Procedural History and Facts

### A.    Facts

The following facts and procedural history are set forth in plaintiff's brief in

support of plaintiff's complaint and motion for  judgment on the pleadings (Doc.

No. 10), and in the administrative transcript[1] (Doc. No. 7).  After a thorough

review of the transcript, the court has corrected errors in plaintiff's brief and added

relevant material as needed.  The defendant incorporates the testimony, evidence

and procedural history into his own brief (Doc. No. 11) with some additions which

will be considered and included below, if deemed relevant, by the court.

Plaintiff's date of birth is April 21, 1980.  She was 27 years old on the

alleged onset date of July 31, 2007.  Her alleged impairments are anxiety,

depression, gastrointestinal problems and severe back pain.  She has an

employment history as, <u>inter alia,</u>  a cashier, customer service representative, bill

collector and sales associate. <u>See</u> Tr. 110.  Her date last insured was March 31,

2010.  Plaintiff has two sons, whose ages were three and nine at the time of the

defendant's unfavorable decision. Tr. 22.

---

[1]        Transcript of the record on review, hereafter "Tr."

Plaintiff alleges that she has been under psychiatric care since an incident that happened at age five, and also saw a psychologist or counselor for depression and anger when she was fifteen. Tr. 174.  On January 7, 2005, plaintiff underwent a psychiatric consultation, performed by Suresh Rayanchia, M.D., for evaluation prior to gastric bypass surgery.  She reported back[2] and knee problems[3] and a diagnosis of gestational diabetes, as well as a suicide attempt, a week-long inpatient psychiatric hospitalization, and therapy at an outpatient location. Plaintiff was diagnosed with adjustment disorder NOS,  major depression, recurrent, moderate without psychosis, and morbid obesity.  Plaintiff was cleared psychiatrically for the surgery (id.) which was performed on February 4, 2005 by

---

[2]     Plaintiff alleges that on September 3, 2003, plaintiff presented to the emergency department after allegedly hurting her back at work while lifting.  Plaintiff was discharged on Hydrocodone and Skelaxin. Tr.161.  However, the Faxton-St. Luke's Healthcare records indicate that "patient woke up this morning with low back pain." Tr. 257.  Multiple views were taken by the medical imaging department, with no definite abnormality found. Tr. 258.  On September 24, 2003, plaintiff returned to the emergency room, complaining of low back pain, right hand pain and swelling and cough.  Plaintiff, a smoker, claimed she had injured her back lifting a laundry basket the previous night, and had "smashed" her day before. No fracture of the hand was found. She was discharged with Advil, Darvocet and Norflex. Tr. 161-62, 257.

[3]     Faxton-St. Luke's Heathcare emergency room records show that on October 21, 2003, plaintiff was treated after an alleged assault, complaining of  three stab wounds in her left leg, including one puncture wound "close to the fibular head of the left knee." Tr. 156.  Surgery was performed on the left knee to remove two jagged fragments of glass and/or mirror. She was discharged on Keflex and Vicodin.  On October 28, 2003, plaintiff told Dr. Gordon Fung that her knee injury occurred when she fell on a piece of glass. Tr. 253. Plaintiff returned to the emergency room on October 30, 2003 complaining of dizziness, shortness of breath, numbness and tingling, after taking Vicodin at 1:00 a.m.  Doctors also determined at that time that plaintiff was sixteen weeks pregnant. Tr. 160, 252.

3

William Graber, M.D. Tr. 178.

Post-gastric bypass surgery, plaintiff was seen again by Dr. Rayanchia, and reported that she was depressed, had no job, was bored, tired and having problems with her boyfriend.  Wellbutrin and Paxil were prescribed. Tr. 173.  On April 13, 2005, plaintiff reported that she couldn't sleep and Trazadone was prescribed in addition to the Wellbutrin and Paxil. Tr. 172.  On April 19, 2005, plaintiff was treated by Gordon Fung, M.D. for tension headaches, insomnia and lightheadedness when standing up. Tr. 247.  On April 26, 2005, plaintiff underwent surgery for videoscopic repair of a ventral hernia, lysis of adhesions, and gastrostomy.  She was discharged with Paxil, Tylenol 3 and an Albuterol nebulizer. Tr. 178.

On October 14, 2005, an x-ray of the lumbar spine revealed that the "disc spaces, facet joints and sacroiliac joints are well maintained."  An x-ray of the bilateral knees revealed "well defined sclerotic osseous foci are demonstrated above and this may reflect osteopoikilosis.  There is narrowing of the lateral joint compartment of the left knee." Tr. 244.

On March 14, 2006, plaintiff was admitted to the hospital for abdominal

pain.[4]  An ultrasound revealed gallstones, and plaintiff's gallbladder was removed on March 16.  The next day she was experiencing pain and was taken back to the operating room for exploratory surgery, where Dr. Graber found blood in the abdomen and a clot in the gallbladder fossa. Tr. 180.  On March 30, 2006, plaintiff was treated by Dr. Fung, claiming that her liver had been knicked during the gall bladder removal.  She complained of right upper quadrant tenderness, right rib pain and depression. She was released on Paxil. Tr. 247.  Dr. Fung treated plaintiff again on April 6, 2006 for headaches with blurred vision.  On April 27, 2006, plaintiff's headaches were improved and she was "doing quite well on the Lexapro" for depression.  Dr. Fung gave plaintiff a slip to get her blood checked for anemia, and stated that plaintiff's asthma was stable on the Albuterol. Tr. 242.  On August 7, 2006, Dr, Fung treated plaintiff for complaints of abdominal pain and insomnia.  Dr. Fung prescribed Ambien for the insomnia. Tr. 242.

On March 15, 2007, plaintiff presented to Dr. Fung complaining of insomnia.  Dr. Fung refilled her prescription for Ambien. On July 10, 2007, plaintiff presented with complaints of asthma, anxiety/depression and panic.  Dr. Fung prescribed Albuterol and Advair for the asthma, and Lexapro for the

---

[4]     The record reveals that plaintiff complained of upper abdominal pain of undetermined origin as early as 1998. Tr. 297.

5

anxiety/depression and panic. Tr. 237.

On July 18, 2007, Colon was treated at the emergency room at Faxton-St. Luke Healthcare for complaints of shortness of breath, hands itching, tightness in throat, shakiness, tingling in fingers, left chest and abdominal pain, nausea and diarrhea.  Records show that plaintiff smokes cigarettes and "[w]e have asked her to quit many times but she is considering it." It was determined that plaintiff had a mild cough and shortness of breath, some abdominal pain, some nausea, some loose bowel movements.  A CT scan of the abdomen and pelvis showed nonspecific findings, a completely normal post gastric bypass CT scan.  Dr. Graber opined that plaintiff might be suffering from a viral syndrome, viral costochondritis, or possibly even peptic ulcer disease.   She was released on high dose Protonix and Carafate. Tr. 188.  Plaintiff again presented at the Faxton-St Luke's emergency room on July 27, 2007, complaining of abdominal pain, and stating that she had been in the emergency room at least twenty times since her gastric bypass surgery two years earlier.  Dr. Timothy Mathis, M.D., diagnosed chronic abdominal pain, most likely secondary to chronic adhesion, and stated that patient wants discharge and no testing, and "wants to go home now with a prescription for Lortab." Tr. 196-97.

On July 31, 2007, Dr. Graber performed an esophagogastrojejunoscopy to

rule out peptic ulcer disease.  Dr. Graber found "expected anatomy after gastric bypass. No anastomotic stricture or ulcer." At that time, plaintiff had lost a total of 108 pounds since the gastric bypass surgery. Tr. 199.   Plaintiff saw Dr. Graber again on August 20, 2007, complaining of intermittent crampy abdominal pain. Dr. Graber recommended videoscopic exploration to look for internal hernias or unusual twists from adhesions. Tr. 210.  That exploratory laparoscopy procedure was performed on August 21, 2007 by Dr. Graber, who found cystic ovaries, no internal hernias, no adhesive disease, normal appendix, normal uterus, and that plaintiff's entire colon was slightly dilated consistent with chronic narcotic use. Dr. Graber could find no reason for plaintiff's pain. Plaintiff discharged on August 23, 2007, with instructions for no heavy lifting.  Plaintiff was also instructed to quit smoking, and was given a prescription of Chantix to facilitate the process, with instructions for its use. Tr. 211-12.

On September 6, 2007, Dr. Fung saw plaintiff for anemia, asthma and abdominal pain. Tr. 237.   On September 13, 2007, plaintiff once again presented to the emergency room with a complaint of abdominal pain, and a pain assessment of eight out of ten, with quivering chin, clenched jaw, uneasy, restless and tense legs, and was squirming and shifting back and forth.  For "history of present illness," the record indicates "history of ovarian cysts." Tr. 219.  A nursing note

asserts that plaintiff stated, "this has nothing to do with Dr. Graber[,] it's my ovaries." Tr. 224.  A real-time trans-abdominal ultrasound examination of the pelvis  was performed on September 14, 2007, which revealed a "normal sonographic appearance of the female pelvis."  Ovaries were normal in size and vascularity.  After the ultrasound, plaintiff reported a pain level of ten out of ten. Plaintiff was discharged that day. Tr. 226, 230.

On November 6, 2007, Dr. Fung treated plaintiff for left side abdominal pain, insomnia, anxiety, depression and dyspepsia.  Plaintiff complained that the Lexapro was not holding her, and Dr. Fung changed her prescription to Cymbalta, with a reference to a counselor.  Dr. Fung continued the Ambien for insomnia and stated that plaintiff was taking Prevacid for dyspepsia. Tr. 231.

A psychiatric evaluation was performed at Community Health and Behavioral Services on November 28, 2007 by Jeanne A. Shapiro, Ph.D.  Her diagnosis was bipolar disorder, panic disorder, and adjustment disorder with anxious mood; borderline intellectual functioning; and abdominal problems, knee problems, and back pain.  In her medical source statement, Dr. Shapiro opined that "[v]ocationally, the claimant may have difficulty at times adequately understanding and following some instructions and directions well as completing some tasks due to attention and concentration deficits secondary to bipolar

8

disorder and anxiety." Tr. 315-16. "She may have difficulty interacting appropriately with others due to emotional liability.  Attending work or maintaining schedule may be difficult given the severity of her psychiatric symptoms.  She does not appropriately manage stress." Tr. 315.

Kalyani Ganesh, M.D., completed an internal medicine examination of plaintiff on December 4, 2007 at the request of the Division of Disability Determination.  Dr. Ganesh diagnosed status post gastric bypass surgery; status post cholecystectomy [gall bladder surgery]; status post exploratory laparoscopy; persistent abdominal pain; asthma; and status post left knee surgery.  Dr. Ganesh's medical source statement stated that plaintiff has no gross limitation to sitting, standing or walking, and has a mild to moderate limitation for lifting, carrying, pushing, and pulling. Tr. 320.

A psychiatric review was performed on January 7, 2008 by non-examining psychiatrist Z. Mata, who opined that plaintiff had mild restriction of daily living activities, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. Tr. 331.  Mata's functional capacity assessment stated that "[e]vidence in file does not support any marked limitations in any of the four basic areas needed for unskilled, entry level work where she would not have to work closely with others." Tr. 337.  Plaintiff

was treated by psychiatrist Firooz Tabrizi, M.D. from September 8, 2008 through January 29, 2009 for complaints of, inter alia, anxiety and panic attacks, poor sleep, depression, anger, sadness, lack of appetite and frequent crying.  Dr. Tabrizi diagnosed generalized anxiety disorder and recommended individual psychotherapy and drug therapy.  Tr. 370-78.

Plaintiff had x-rays taken of her spine on January 27, 2009, which revealed "17 degrees of dextroscoliosis ... at the thoracolumbar junction.  There is associated asymmetrical disc space narrowing near the apex of the curvature.  This study is otherwise normal." Tr. 357.  Plaintiff underwent physical therapy from February 11, 2009 through March 2, 2009 with physical therapist Roger W. Herbowy, PT.  On February 11, Herbowy noted that plaintiff had received previous physical therapy from his facility in October through December of 2008, was sporadic in keeping her physical therapy appointments, and he noted that plaintiff's condition had worsened.  Herbowy wrote that "[a]s she presents herself today, she is much more disabled secondary to lumbarsacral neuropathy." He assessed plaintiff's condition by saying, "I think at this point she certainly shows some neurological deficit which was not the same as when I saw her on 12/16/08." Tr. 360.  On March 2, 2009, Herbowy opined that plaintiff has no significant change in status, and that she has severe muscle spasms and is in obvious

discomfort. Tr. 359.

Plaintiff underwent an MRI on March 2, 2009, and the impression arrived at by the radiologist was (1) "Broad based disc herniations are noted at L3-5, L4-5 and L5-S1 ... While the disc bulges and disc herniations abut [sic] the descending nerve root sheaths bilaterally at L4-5 and L5-S1 and on the left at L3-4, no direct nerve root compression is visualized," and (2) "there is mild degenerative disc and bony change throughout the lumbar spine and moderate degenerative bony change throughout the lower lumbar spine.  There is dextroscoliosis of the thoracolumbar and upper lumbar region. The remainder of the study is normal." Tr. 355.

On March 14, 2009, Dr. Tabrizi treated plaintiff for sleep disturbance, and noted that she was depressed, anxious and labile. Tr. 371.  On March 29, 2009, Dr. Tabrizi found plaintiff again to be depressed and anxious, with concentration impaired, and complaining of panic attacks.  Dr. Tabrizi continued individual psychotherapy and drug therapy. Tr. 370.

Plaintiff's hearing before the ALJ was held on April 30, 2009. Tr. 32.  On May 5, 2009, a post-hearing medical interrogatory was completed by non-examining medical expert Martin Fechner, M.D., who concluded that plaintiff could perform sedentary work. Tr. 364.  Dr. Fechner concluded, inter alia, that in an eight hour work day, plaintiff could sit for six hours with three to five-minute

11

breaks per hour, and could stand or walk two hours aggregate in an eight hour day. Tr. 365.  In addition, Dr. Fechner opined that plaintiff could occasionally lift or carry up to ten pounds, but could never lift or carry eleven to twenty pounds. Tr. 364.

Plaintiff's treating psychiatrist, Dr. Tabrizi, completed a post-hearing Medical Examination for Employability Assessment, Disability Screening, and Alcohol/Drug Determination Form. Tr. 14-15.  Dr. Tabrizi noted plaintiff's treatment of psychotherapy and drug therapy since September of 2008 for generalized anxiety disorder. Tr. 14.  Dr. Tabrizi's assessment differed markedly from that of non-examining medical expert Fechner in finding that plaintiff was very limited in the following areas of mental functioning: (1) understands and remembers instructions; (2) carries out instructions; (3) maintains attention/concentration; (4) maintains socially appropriate behavior without exhibiting behavioral extremes; and (6) appears able to function in work setting at a consistent pace. Tr. 14.

### B.    Procedural History

Plaintiff filed an application for SSDI and SSI benefits on October 1, 2007, alleging an onset date of July 31, 2007, claiming impairments of anxiety, depression, gastrointestinal problems, and severe back pain.  The applications

12

were initially denied on January 9, 2008.  Plaintiff filed a timely request for a

hearing with an Administrative Law Judge ("ALJ") on January 14, 2008.  As

stated above, that hearing was held on April 30, 2009.  On June 25, 2009, the ALJ

rendered an unfavorable notice of decision.  Tr. 16.

Plaintiff filed a timely appeal to the Appeals Council of the Office of

Disability Adjudication and Review ("Appeals Council") on July 21, 2009.  Tr.

12.  Plaintiff obtained counsel to assist with her appeal on August 24, 2009. Tr. 7.

By letter dated October 23, 2009, the Appeals Council notified counsel for

plaintiff that the Appeals Council would allow twenty five days from the date of

the letter to submit new evidence, such evidence required to be "new and material

to the issues considered in the hearing decision dated June [25], 2009.  By letter

dated December 14, 2010, the Appeals Council notified plaintiff that her request

for review had been denied. Tr. 1.  This action followed on January 25, 2011. Doc.

No. 1.

## C.    Contentions

Plaintiff now argues that the ALJ failed to adhere to the requirements

necessary to obtain a post-hearing medical expert opinion.  Next, the plaintiff

posits that when the ALJ did not make a function-by-function finding, he[5] [sic]

---

[5]        The court notes that the ALJ in the instant case, Michal L. Lissek, is a female.

failed to comply with the legal standards set forth in SSR 96-8p.  Consequently, plaintiff argues that the residual function capacity ("RFC") finding was unsupported by substantial evidence.  Plaintiff also asserts that the ALJ failed to follow the treating physician rule, which also rendered the RFC finding unsupported by substantial evidence, and failed to apply the appropriate legal standards in assessing plaintiff's credibility.  Finally, plaintiff argues that the plaintiff has not met his burden at Step 5 because the ALJ inappropriately relied on the direct application of the medical vocational guidelines without consulting a vocational expert.

## II.   Discussion

### A.   Standard of Review

This court does not review a final decision of the Commissioner de novo, but instead "must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."  Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004) (internal citations omitted).  See also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004);  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Halloran, 362 F.3d at 31 (quoting Richardson

v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)).  "An ALJ must set forth the
crucial factors justifying his findings with sufficient specificity to allow a court to
determine whether substantial evidence supports the decision."  Gravel v.
Barnhart, 360 F.Supp.2d 442, 444-45 (N.D.N.Y. 2005) (citing Ferraris v. Heckler,
728 F.2d 582, 587 (2d Cir. 1984)).   When reviewing a determination by the
Commissioner, a district court, in its discretion, "shall have the power to enter,
upon the pleadings and transcript of record, a judgment affirming, modifying, or
reversing the decision of the Commissioner of Social Security, with or without
remanding the cause for a rehearing."  42 U.S.C. § 405(g).

### B.    Disability Defined

An individual is considered disabled for purposes of his or her eligibility for
Social Security Disability if he or she is unable to

> engage in any substantial gainful activity by reason of
> any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

The Commissioner may deem an individual applicant for Social Security
Disability to be disabled

> only if his physical or mental impairment or impairments

> are of such severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Social Security Administration regulations set forth a five-step sequential

evaluation process, by which the Commissioner is to determine whether an

applicant for Social Security Disability is disabled pursuant to the aforementioned

statutory definition.  See 20 C.F.R. § 404.1520.  The Second Circuit Court of

Appeals summarizes this process as follows:

> The first step of this process requires the Secretary to
> determine whether the claimant is presently employed. If
> the claimant is not employed, the Secretary then
> determines whether the claimant has a "severe
> impairment" that limits [his] capacity to work. If the
> claimant has such an impairment, the Secretary next
> considers whether the claimant has an impairment that is
> listed in Appendix 1 of the regulations. When the
> claimant has such an impairment, the Secretary will find
> the claimant disabled. However, if the claimant does not
> have a listed impairment, the Secretary must determine,
> under the fourth step, whether the claimant possesses the
> residual functional capacity[6] to perform [his] past

---

[6]     Residual functional capacity ("RFC") refers to what a claimant can still do in a
work setting despite any physical and/or mental limitations caused by his or her impairments and

> relevant work. Finally, if the claimant is unable to
> perform [his] past relevant work, the Secretary
> determines whether the claimant is capable of
> performing any other work. If the claimant satisfies [his]
> burden of proving the requirements in the first four steps,
> the burden then shifts to the Secretary to prove in the
> fifth step that the claimant is capable of working.

Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).

The fifth step "requires the [ALJ] to consider the so-called vocational factors (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy." Quezada v. Barnhart, 2007 WL 1723615 (S.D.N.Y. 2007) (internal quotations omitted).

As a threshold issue, the court emphasizes that 42 U.S.C. § 423(d)(1)(A) specifically states that a person is deemed disabled if he or she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. Substantial work activity is defined as "work activity that involves doing

---

any related symptoms, such as pain.  An ALJ must assess the patient's RFC based on all the relevant evidence in the case record. See 20 C.F.R. § 404.1545 (a)(1).

significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  Gainful work activity is defined as "work activity that you do for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(a-b) (West 2009).

### C.    ALJ's requirement to obtain post-hearing medical expert opinion

It is well-established law that an ALJ has a responsibility to develop the record at the administrative level. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir.1999).  "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding." Pratts v. Chater, 94 F3. 34, 37 (2d Cir. 1996) (quoting Echevarria v. Secretary of HHS, 685 F.2d 751, 755 (2d Cir.1982)). "This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, 20 C.F.R. § 404.1512(d)-(f) (1995), and exists even when, as here, the claimant is represented by counsel." Id. (quoting Perez v. Chater, 77 F.3d 41, 47 (2d Cir.1996)).  In the instant case, plaintiff was acting pro se at the time of the hearing, thereby increasing the ALJ's inherent obligation to develop the medical

18

record.  Plaintiff argues that the ALJ obtained medical expert evidence post-hearing [May 5, 2009] and relied upon that evidence to support the physical portion of the RFC finding, but in requesting the interrogatory from the medical expert, Dr. Fechner, the ALJ did not follow the appropriate legal procedures as required under HALLEX[7]-I-2-5.  Specifically, plaintiff asserts that the ALJ did not exhibit the initial letter to the medical expert [wherein the ALJ presumably requested the medical expert's opinion], which plaintiff alleges, is error. Doc. No. 10, p. 13.  Plaintiff also argues that it is unclear whether the ALJ furnished the medical expert with all pertinent medical reports, including the treatment notes of Dr. Tabrizi.  Plaintiff argues that the medical expert's opinion was made prior to Dr. Tabrizi's opinion dated July 14, 2009, submitted two months after the medical expert's report.  Id., p. 14.

Defendant counters that the relevant HALLEX provision,  I-2-5-36(A) states that all correspondence with a medical expert must be made part of the record, and that the ALJ will furnish the medical expert with copies of pertinent medical reports and lay evidence.   Defendant argues that plaintiff does not identify the "initial correspondence" she claims was not made part of the record,

---

[7]        HALLEX is the acronym used by the SSA for "Hearings, Appeals and Litigation Law Manual." See http://www.ssa.gov/OP_Home/hallex/hallex.html (2012).

and in fact both the questions posed to the Dr. Fechner and his responses were made part of the record. Doc. No 11, p. 9.   Defendant also asserts that the medical expert's evidence was proffered to the plaintiff on the same day it was prepared, and in the proffer letter, the ALJ gave plaintiff the opportunity submit written comments about the evidence, to submit written questions to Dr. Fechner, or to request a supplemental hearing, at which plaintiff would have had the opportunity to submit additional evidence and to question Dr. Fechner.  Tr. 30-31.  Regarding plaintiff's assertion that without benefit of Dr. Tabrizi's treatment notes and opinion, the use of the medical expert's opinion was improper, the court notes plaintiff's own admission that the medical expert's opinion was used to assess and support the physical portion of the RFC finding. Doc. No. 10, p. 13.  As stated supra, Dr. Tabrizi was plaintiff's treating psychiatrist, and any notes or opinion from him relate solely to plaintiff's mental condition.  Defendant also argues, and the court concurs, that if the ALJ failed to precisely follow any procedures set forth in the HALLEX, the plaintiff was not prejudiced in any way, and the error, if any, was harmless.  Accordingly, the court finds that the ALJ met her duty to develop the post-hearing record, and the procedural error, if any, was harmless.

### D.    Requirement for function-by-function analysis in assessing RFC

Plaintiff argues that although the ALJ found that plaintiff had the RFC to

perform sedentary work, the ALJ erred when she failed to make a function-by-function assessment of the plaintiff's exertional abilities.  In addition, Dr. Fechner's statement that plaintiff could sit for 6 hours "with 3-5 minute breaks per hour" is inconsistent with the RFC of sedentary work.  Plaintiff also argues that the ALJ's RFC finding was unsupported by substantial evidence.

RFC is defined in the regulations as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continued basis," which means "8 hours a day, for 5 days a week, or an equivalent work schedule."  RFC is the most an individual can do despite his or her limitations or restrictions.  Social Security Ruling 96-8p (West 2009).

> The RFC assessment must be based on *all* of the relevant evidence in the case record, such as:
>
> [m]edical history, [m]edical signs and laboratory findings, [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), [r]eports of daily activities, [l]ay evidence, [r]ecorded observations, [m]edical source statements, [e]ffects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, [e]vidence from attempts to work, [n]eed for a structured living environment, and [w]ork evaluations, if available.

Id. (emphasis in original).

Courts in this district have recently addressed the function-by-function

assessment issue.  As in the case before the court, the court in <u>Kelly v. Astrue</u>

wrote that "[t]he ALJ in this case did not provide a function-by-function analysis.

Rather, he simply expressed the RFC in terms of an [exertional] level of work ( i.e.

sedentary), with some limitations. The Second Circuit has not yet decided whether

non-compliance with SSR 96-8p is <u>per</u> <u>se</u> grounds for a remand." 2011 WL

817507 AT * 8 (N.D.N.Y. 2011).  The Third and Sixth Circuits have held that

"[a]lthough a function-by-function analysis is desirable, the ALJ need not discuss

each factor in his written opinion ... District courts in the Second Circuit have

reached different conclusions, with courts in the Northern and Western Districts of

New York generally concluding that a remand is required when the ALJ fails to

provide a function-by-function analysis." <u>Id.</u>  The <u>Kelly</u> court opined that it was

"inclined toward the view that, in limited circumstances, the ALJ's failure to

provide a function-by-function analysis might constitute harmless error, provided

that the absence of the analysis did not frustrate meaningful review of the ALJ's

overall RFC assessment." <u>Id.</u>

  Defendants argue that "plaintiff neglects to mention that the ALJ stated that

plaintiff could perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and

416.967(a) ...." Doc. No. 11, p. 11.  "Those regulations, in turn, define sedentary

work as involving lifting no more than 10 pounds at a time and occasionally lifting

or carrying articles like docket files, ledgers and small tools.  Although a sedentary

job is defined as one which involves sitting, a certain amount of walking and

standing is often necessary in carrying out job duties.  Jobs are sedentary if

walking and standing are required occasionally and other sedentary criteria are

met." Id., quoting 20 C.F.R. §§ 404.1567(a) and 416.967(a).

The court finds that the ALJ's determination, looked at in its entirety,

provided a complete, thoughtful and adequate description of the plaintiff's medical

history, impairments and RFC.  Coupled with the criteria set forth above in

determining RFC, including the undisputed fact that plaintiff's impairments cause

only mild restriction in her day to day living activities, the court finds that the

ALJ's absence of a function-by-function analysis is, at worst, harmless error.

### E.    The Treating Physician's Rule

Plaintiff's next challenge to the ALJ's decision is that the ALJ failed to

follow the treating physician's rule, which also allegedly rendered the RFC finding

unsupported by substantial evidence, and failed to apply the appropriate legal

standards in assessing the plaintiff's credibility.  According to the "treating

physician's rule,"[8] the ALJ must give controlling weight to the treating physician's

---

[8]       "The 'treating physician's rule' is a series of regulations set forth by the
Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating
physician's opinion." de Roman v. Barnhart, 2003 WL 21511160, at *9 (S.D.N.Y. 2003).

opinion when the opinion is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); see also Green-Younger v.

Barnhart, 2003 WL 21545097 at *6 (2d Cir.2003); Shaw v. Chater, 221 F.3d 126,

134 (2d Cir.2000).

   "Even if a treating physician's opinion is deemed not to be deserving of

controlling weight, an ALJ may nonetheless give it 'extra weight' under certain

circumstances." Comstock v. Astrue, 2009 WL 116975 at * 4 (N.D.N.Y. 2009).

> Under C.F.R. § 404.1527(d)(1)-(6), the ALJ should
> consider the following factors when determining the
> proper weight to afford the treating physician's opinion if
> it is not entitled to controlling weight: (1) length of the
> treatment relationship and the frequency of examination,
> (2) nature and extent of the treatment relationship, (3)
> supportability of opinion, (4) consistency, (5)
> specialization of the treating physician, and (6) other
> factors that are brought to the attention of the court.

Comstock, 2009 WL 116975 at *4.

   In the instant case, the plaintiff alleges that the ALJ did not give controlling

weight to the opinion of plaintiff's treating physician, Dr. Tabrizi, and also states

that the record contains no treating physician or other medical opinion of the

plaintiff's abilities on a function-by-function basis, nor did the ALJ make a

reasonable efforts to obtain such an opinion from a treating source.  Doc. No 10,

24

pp. 15, 17.  Defendant argues, and the court concurs, that there are numerous

opinions in the record regarding plaintiff's functional abilities.  Plaintiff's medical

history and record was extensive, consistent, and fully developed.  The record

indicates that Dr. Tabrizi treated plaintiff from September of 2008.  Despite the

fact that Dr. Tabrizi was a relative newcomer in the group of physicians,

psychologists and other health care workers who made up plaintiff's treating

physicians, plaintiff argues that his opinion should have controlling weight. Doc.

No. 10, p. 20.   The ALJ took note of Dr. Tabrizi's treating notes and wrote that

plaintiff "started seeing Dr. Tabrizi a few months ago." Tr. 27.  As defendant

argues, Dr. Tabrizi's subsequent opinion regarding plaintiff's mental abilities was

submitted after the ALJ's decision.  Consequently, the ALJ did not and could not

have failed to follow the treating physician's rule by not giving Dr. Tabrizi's

opinion controlling weight.

### F.    Legal Standards for Assessing Credibility

This court has found that "[a] claimant must present medical evidence or

findings that the existence of an underlying condition could reasonably be

expected to produce the symptomatology alleged." Sweat v. Astrue, 2011 WL

2532932 at * 10 (N.D.N.Y. 2011).  "As for the ALJ's credibility determination,

while an ALJ is required to take the claimant's reports of pain and other

limitations into account, 20 C.F.R. § 416.929, he or she is not required to accept the claimant's subjective complaints without question.  Rather, the ALJ may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Campbell v. Astrue, 2012 WL 29321at * 2 (2d Cir. 2012) (internal quotations omitted) (citing Genier v. Astrue, 606 F.3d 46, 49 (2d Cir.2010)).  "This requires a two-step process. First, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  If so, the ALJ must then consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. For purposes of our review, however, we have long held that it is the function of the Commissioner, not ourselves, ... to appraise the credibility of witnesses, including the claimant." Id. (internal citations and quotation marks omitted).

In this case, the ALJ wrote that "[a]fter careful consideration of the evidence, the undersigned finds that claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual capacity assessment." Tr. 27.  Plaintiff argues

that the ALJ failed to apply the appropriate legal standards.  Plaintiff asserts that

"the ALJ summarized some of the medical evidence, activities of daily living,

some of the past treatment and symptoms, and some medications but did not

provide a rationale as to why they undermined his [sic] claimed symptoms or

supported a finding that she could perform work on a regular and continuing

basis." Doc. No. 10, p.25.  Defendant counters that the ALJ correctly cited the law

regarding the evaluation of plaintiff's subjective complaints and considered

plaintiff's testimony in detail.  The court concurs.  The ALJ discussed plaintiff's

anxiety disorder, back pain, work history, treatment, alleged limitations and daily

activities in detail.  The ALJ presented the findings of the medical and psychiatric

doctors, and references plaintiff's daily activities, including the ability of the

plaintiff to cook, clean, shop, do laundry and care for her son.  As stated above, it

is not the function of the court to substitute its findings of plaintiff's credibility for

that of the ALJ, but rather, to determine whether the ALJ's determination is

correct.  The court concludes that it is, and that the ALJ correctly determined that

the plaintiff was able to perform a wide range of unskilled sedentary work.

### G.    Requirement to Consult a Vocational Expert

Finally, plaintiff argues that because she had significant nonexertional

limitations, the ALJ erred in failing to call a vocational expert ("VE").  Defendant

counters that because of the plaintiff's RFC assessment, young age, and education, the ALJ correctly found that there was other work in the national economy which plaintiff could perform.

This court has held that "[i]f the non-exertional impairment or impairments *do significantly diminish* the individual's ability to perform a full range of the exertional category of work, then the ALJ may use a VE to satisfy the Commissioner's burden to show that the plaintiff can perform substantial gainful work at step five of the disability analysis." Anderson v. Commissioner of Social Security, 2009 WL 3064764 (N.D.N.Y. 2009) (citing Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986)) (emphasis added).  "[A]pplication of the grid guidelines and the necessity for expert testimony must be determined on a case-by-case basis. If the guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate. But if a claimant's nonexertional impairments significantly limit the range of work permitted by his exertional limitations then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments." Id. (internal quotations omitted).

In the case at bar, the court notes that the ALJ used the relevant regulations and guidelines and provided considerable analysis in determining plaintiff's

"limitation to sedentary work with no more than three step instructions with limited contact with the public simply results in the claimant being restricted to 'simple duties' that constitute unskilled work." Tr. 28.  Plaintiff's greatest nonexertional complaint throughout the record was that she couldn't work with people.  The ALJ considered that complaint, and found that her nonexertional complaint did not diminish the range of work plaintiff could perform, thereby negating the need for the services of a VE.  Based on the ALJ's detailed analysis and use of the relevant guidelines, the court finds that the ALJ was not required to call a vocational expert.  Accordingly, based on the record before it, the court finds that the ALJ applied the correct legal standards, and her finding that plaintiff is not disabled is supported by substantial evidence.

## III.   Conclusion

For the reasons set forth <u>supra</u>, the defendant's motion for judgment on the pleadings is hereby GRANTED.   Plaintiff's motion for judgment on the pleadings is hereby DENIED.  The Clerk is requested to close this case.

SO ORDERED.

January 19, 2012.

_____
Neal P. McCurn
Senior  U.S. District Judge